1   Gerald D. Kim (SBN No. 216894)
    Counsel
2   SCREEN ACTORS GUILD, INC.
    5757 Wilshire Boulevard, 7th Floor
3   Los Angeles, California 90036-3600
    Telephone:  (323) 549-6481
4   Facsimile:   (323) 549-6624
    gkim@sag.org
5

6   Attorney for Petitioner
    Screen Actors Guild, Inc.
7

8               UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11  SCREEN ACTORS GUILD, INC., a          Case No.  CV11-02264 VBF (JCGx)
    non-profit corporation on behalf of
12  Affected Performers,                   NOTICE OF MOTION AND
                                           MOTION FOR ORDER
13              Petitioner,                CONFIRMING ARBITRATION
                                           AWARD AND FOR ENTRY OF
14  v.                                     JUDGMENT IN CONFORMITY
                                           THEREWITH; MEMORANDUM OF
15  DOMINION ENTERTAINMENT,                POINTS AND AUTHORITIES; AND
    INC. and RAZOR DIGITAL                 DECLARATION OF GERALD D.
16  ENTERTAINMENT LLC,                     KIM IN SUPPORT THEREOF

17              Respondents.               Date: 4/25/11
                                           Time: 1:30 pm
18                                         Place: courtroom 9
                                           Judge:
19                                                Fairbank

20

21              __NOTICE OF MOTION AND MOTION__

22  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

23  PLEASE TAKE NOTICE that on _____, 2011,

24  at _____ a.m./p.m., or as soon as this matter may be heard, petitioner Screen

25  Actors Guild, Inc. ("SAG") will move, and hereby does move, the United States

26  District Court, located in Courtroom ____ at _____,

27  Los Angeles, California, for an Order that:

28  ///

                                    - 1 -

COPY

1. Confirms the arbitration award in favor of SAG and against respondents Dominion Entertainment, Inc. ("Dominion Entertainment") and Razor Digital Entertainment LLC (collectively "Respondents"), SAG Case No. 2005-0143, dated March 16, 2007 ("Arbitration Award"), in all respects;

2. Enters judgment in conformity therewith;

3. Awards SAG attorney's fees and costs;

4. Awards such other and further relief as the Court deems just and proper.

This motion is made pursuant to a collective bargaining agreement by which SAG obtained the Arbitration Award against Respondents and which expressly provides that the Arbitration Award may be confirmed by the present Court.

This Court's jurisdiction arises under section 301(a) of the Labor Management Relations Act of 1947 ("LMRA") (29 USC § 185(a)), as amended, which grants the District Court original jurisdiction over actions relating to violations of collective bargaining agreements between an employer and a labor organization in an industry affecting interstate commerce, without regard to the amount in controversy or the citizenship of the parties.

Venue is proper in the Central District of California because the Arbitration Award was issued in this district, and because the petitioner maintains its principal place of business in this district.

This motion is based upon this Notice of Motion and Motion as well as the attached Memorandum of Points and Authorities, Declarations of Gerald D. Kim and Thomas Howard, all pleadings and papers on file, and upon such further oral or documentary evidence that may be presented at the time of hearing.

///

///

///

1    Petitioner SAG contacted Respondents, by telephone and mail, to conference

2    regarding the current motion pursuant to Local Rule 7-3.  Respondents, however,

3    failed to resolve the present dispute or to respond to SAG.

4    Dated: March 16, 2011                    Respectfully Submitted,

5                                             SCREEN ACTORS GUILD, INC.

6

7                                             By: _____

8                                                 Gerald Kim
                                                  Attorney for Petitioner

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Petitioner Screen Actors Guild, Inc. ("SAG") respectfully submits the following Points and Authorities in support of its motion to confirm an arbitration award and enter a corresponding judgment.

### I.   STATEMENT OF FACTS

A.   The Parties and Underlying Dispute

Established in 1933, SAG is a union that represents nearly 120,000 actors who work in motion pictures, television, and other media formats. See Declaration of Gerald D. Kim ("Kim Dec."), ¶ 3. Respondent Dominion Entertainment, Inc. ("Dominion Entertainment") and SAG executed a Theatrical Adherence Letter ("Theatrical Adherence Letter") and a Screen Actors Guild Modified Low Budget Agreement ("Low Budget Agreement"), both dated April 6, 2000, in connection with the motion picture entitled *Gangland* (collectively "Movie"). Among other things, said agreements bound Dominion Entertainment to the terms and conditions of a collective bargaining agreement, the Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, as amended ("Basic Agreement"). True and correct copies of the Theatrical Adherence Letter and Low Budget Agreement is attached to Kim Dec. as <u>Exhibit A</u>.[1] A true and correct copy of relevant portions of the Basic Agreement is attached to Kim Dec. as <u>Exhibit B</u>.[2]

Dominion Entertainment executed a Security Agreement, dated April 7, 2000, in favor of SAG to secure the performance of all of Dominion Entertainment's obligations, including payment obligations to SAG's members, with respect to the Movie ("Security Agreement"). Kim Dec., ¶ 5. Pursuant to the terms of the Theatrical Adherence Letter, Low Budget Agreement, the Basic Agreement, and the Security Agreement, Dominion Entertainment produced the Movie using SAG actors or other performers covered by said agreements

---

[1] All referenced exhibits throughout the memorandum of points and authorities are expressly incorporated herein as if set forth in full.
[2] Because the Basic Agreement is 656 pages in length, only relevant portions of the document have been attached.

MEMO OF POINTS AUTHORITIES IN SUPPORT OF MOTION FOR ORDER CONFIRMING ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT

1    (collectively "Performers").  Kim Dec., ¶ 6.

2           Razor Digital Entertainment LLC ("Razor Digital Entertainment") acquired

3    certain copyrights to the Movie.  *Id.* at ¶ 7.  (Dominion Entertainment and Razor

4    Digital Entertainment shall be referred to collectively as "Respondents".)

5           Respondents exhibited the Movie in one or more non-theatrical markets.  *Id.*

6    at ¶ 8.  As a result, Respondents became obligated to pay Performers additional

7    compensation, known as residuals, pursuant to section 5 of the Basic Agreement.

8    A true and correct copy of relevant portions of the Basic Agreement is attached to

9    Kim Dec. as <u>Exhibit B</u>.  Additionally, pension and health contributions ("P & H")

10   became due and payable on behalf of Performers pursuant to section 34 of the

11   Basic Agreement.  *Id.* at ¶ 9.

12          Respondents failed or refused to pay the amounts due to Performers.  Kim

13   Dec., ¶ 10.  Because Respondents failed or refused to pay residuals, late payment

14   liquidated damages ("LPLDs") also became due pursuant to section 5(E) of the

15   Basic Agreement.  A true and correct copy of relevant portions of the Basic

16   Agreement is attached to Kim Dec. as <u>Exhibit B</u>.

17   B.     <u>SAG Obtains Arbitration Award Against Respondents</u>

18          On January 3, 2006 pursuant to the arbitration provision (section 9) of the

19   Basic Agreement, SAG served a statement of claim and demand for arbitration on

20   Respondents for failure to pay the above residuals, pension and health

21   contributions as well as LPLDs.  A true and correct copy of relevant portions of the

22   Basic Agreement is attached to Kim Dec. as <u>Exhibit B</u>.  A true and correct copy of

23   the statement of claim and demand for arbitration, including proof of service, is

24   attached to Kim Dec. as <u>Exhibit C</u>.  The statement of claim and demand for

25   arbitration was served in accordance with the notice provision (section 42) of the

26   Basic Agreement.  A true and correct copy of relevant portions of the Basic

27   Agreement is attached to Kim Dec. as <u>Exhibit B</u>.

28   ///

MEMO OF POINTS AUTHORITIES IN SUPPORT OF
MOTION FOR ORDER CONFIRMING ARBITRATION
AWARD AND FOR ENTRY OF JUDGMENT

1    Sara Adler ("Arbitrator") was selected as the sole neutral arbitrator.  Kim

2    Dec., ¶ 14.  SAG notified Respondents by letter, dated October 6, 2006, at their last

3    known addresses regarding the arbitration hearing to be held on November 6, 2006.

4    The arbitration date was later continued to January 26, 2007.  *Id.*  A true and

5    correct copy of the notice of arbitration hearing is attached to Kim Dec. as <u>Exhibit</u>

6    <u>D</u>.[3]  Pursuant to the arbitration provision of the Basic Agreement, Sara Adler

7    issued an arbitration award ("Arbitration Award"), dated March 16, 2007, in favor

8    of SAG and against Respondents.  A true and correct copy of the Arbitration

9    Award is attached to Kim Dec. as <u>Exhibit E</u>.

10       The Arbitration Award provides the following relief:

11       "1.  Producer and Distributor [Dominion Entertainment and Razor Digital

12            Entertainment respectively] with joint and several liability are ordered

13            to pay SAG the total amount of $95,000.

14       2.  Pursuant to the provisions of the Security Agreement, SAG is granted

15            an assignment of Producer's accounts receivable from the distribution,

16            exhibition, exploitation or other use of the Picture anywhere in the

17            world until the amounts due are paid in full.

18       3.  The parties are to split the $600 fee of the Arbitrator."

19       *Id.*

20       Respondents were notified of the arbitration award, including a copy of the

21    award.  True and correct copies of letters to the arbitration parties, notifying them

22    of the award, is attached to Kim Dec. as <u>Exhibit F</u>.

23       Despite SAG's demand, Respondents have failed and continues to fail to pay

24    SAG the total amount of $95,000 required by the Arbitration Award, and to

25    otherwise comply with the Arbitration Award.  Kim Dec. at ¶ 17.

26

27    [3] The October 6, 2006 letter from SAG to Respondents contains two typographic errors: (i) it incorrectly refers to an
      earlier letter dated "January 5, 2005" which was actually dated "January 3, 2006", and (ii) it incorrectly refers to an
28    "Amended Statement of Claim and Demand for Arbitration" which was actually a "Statement of Claim and Demand
      for Arbitration."  Kim Dec., ¶ 14.

MEMO OF POINTS AUTHORITIES IN SUPPORT OF
MOTION FOR ORDER CONFIRMING ARBITRATION
AWARD AND FOR ENTRY OF JUDGMENT

1    C.    <u>SAG Presently Seeks Confirmation of the Arbitration Award, Entry of Judgment, and Attorney's Fees and Costs</u>

2

3    SAG hereby seeks an order from this Court confirming the Arbitration

4    Award, with late payment liquidated damages accruing until the date of

5    confirmation.  SAG also requests that judgment be entered in conformity with the

6    Arbitration Award as well as attorney's fees and costs.  Pursuant to Local Rule 7-3,

7    SAG contacted Respondents, by telephone and mail, to conference regarding the

8    current motion pursuant to Local Rule 7-3.  *Id.* at ¶ 18 and a true and correct copy

9    of SAG's correspondence to Respondents is attached to Kim Dec. as <u>Exhibit G</u>.

10   Respondents, however, failed to resolve the present dispute or to respond to SAG.

11   *Id.*

12                    II.    <u>LAW AND ARGUMENT</u>

13   A.    <u>This Court Is Empowered To Confirm the Arbitration Award</u>

14   The District Courts are empowered to enforce arbitration awards issued in

15   accordance with a collective bargaining agreement.  *United Steelworkers of*

16   *America v. Enterprise Wheel and Car Corp.*, 363 U.S. 597, 80 S.Ct. 1358, 4 L.Ed.

17   2d 1424 (1960).  The Arbitration Award in favor of SAG and against Respondents

18   was awarded pursuant to a collective bargaining agreement, the Basic Agreement.

19   A true and correct copy of the Arbitration Award is attached to Kim Dec. as

20   <u>Exhibit G</u>.  Section 9(F) of the Basic Agreement provides that the Arbitration

21   Award may be confirmed in any court of competent jurisdiction.  A true and

22   correct copy of relevant portions of the Basic Agreement is attached to Kim Dec.

23   as <u>Exhibit B</u>.  Accordingly, this Court is empowered to confirm and enforce the

24   Award.

25   B.    <u>An Arbitration Award Must Be Confirmed If It Draws Its Essence From the Collective Bargaining Agreement</u>

26

27   Under the *United Steelworkers* trilogy of cases, the Court will not review the

28   substantive merit of an arbitration award made in accordance with a collective

MEMO OF POINTS AUTHORITIES IN SUPPORT OF
MOTION FOR ORDER CONFIRMING ARBITRATION
AWARD AND FOR ENTRY OF JUDGMENT

1  bargaining agreement.  See *United Steelworkers v. American Manufacturing Co.*,

2  363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v.*

3  *Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d. 1409

4  (1960); *United Steelworkers v. Enterprise Wheel and Car Co.*, supra.  Instead, the

5  Court will defer to the arbitrator's legal and factual determinations.  *American*

6  *Postal Workers' Union AFL-CIO v. United States Postal Service*, 682 F.2d 1280,

7  1284 (9th Cir. 1982), *cert. denied*, 459 U.S. 1200, 103 S.Ct. 1183, 75 L.Ed.2d 431

8  (1983).

9  C.    <u>The Present Arbitration Award Should Be Confirmed Because the Arbitrator</u>
10        <u>Found That Respondents Breached Their Obligations To SAG</u>

11         In the current case, the Arbitrator applied the relevant provisions of the Basic

12  Agreement to the facts, found that Respondents breached their obligations under

13  the Basic Agreement as well as under the Security Agreement, and awarded

14  damages and other relief in favor of SAG and against Respondents.  A true and

15  correct copy of the Arbitration Award is attached to Kim Dec. as <u>Exhibit E</u>.  As a

16  matter of public policy and in the interest of the stability of labor relations, as well

17  as in accordance with Congress' intent as interpreted by the U.S. Supreme Court,

18  the Basic Agreement and the Arbitration Award must be enforced.  Accordingly,

19  the Arbitration Award should be confirmed and judgment entered in conformity

20  therewith.  *United Steelworkers of America v. Enterprise Wheel and Car Corp.*,

21  *supra.*

22  D.    <u>Petitioner SAG Should Be Awarded Its Attorney's Fees and Costs</u>

23         Attorney's fees may be recovered in an action brought under Section 301 of

24  the LMRA (29 U.S.C. §185) where a party without justification refuses to abide by

25  the arbitration award.  *International Union of Petroleum and Industrial Workers v.*

26  *Western Industrial Maintenance, Inc.*, 707 F.2d 425, 428 (9th Cir. 1983); see also

27  *UAW v. United Farm Tools, Inc.*, 762 F.2d 76, 77 (8th Cir. 1985) (unjustified

28  ///

MEMO OF POINTS AUTHORITIES IN SUPPORT OF
MOTION FOR ORDER CONFIRMING ARBITRATION
AWARD AND FOR ENTRY OF JUDGMENT

1  refusal to abide by arbitration award, combined with failure to act to set aside

2  award, is evidence of bad faith sufficient to warrant attorney's fees).

3       Respondents have failed to assert or demonstrate any legal justification for

4  failing to comply with the Arbitration Award.  Instead, Respondents have forced

5  SAG to initiate this action in Federal Court to confirm and enforce the Arbitration

6  Award.  Considering the prevailing rate for attorney's fees, as well as the estimated

7  8 hours that SAG's attorney worked or will have worked in preparing the present

8  motion and supporting documents as well as court appearance time, SAG

9  respectfully requests that this Court award attorney's fees in the amount of

10  $3,200.00 and costs in the amount of $350.00 as set forth in the accompanying

11  declaration.  Kim Dec., ¶¶ 19-26.

## III.   CONCLUSION

13       For the foregoing reasons, petitioner Screen Actors Guild, Inc. requests that

14  the Court confirm the Arbitration Award, enter judgment in conformity therewith,

15  and award attorney's fees to Screen Actors Guild, Inc. in the amount of $3,200.00

16  and costs in the amount of $350.00.

17  Dated: March 16, 2011

                            Respectfully Submitted,

                            SCREEN ACTORS GUILD, INC.

                            By:  _____

                                Gerald Kim
                                Attorney for Petitioner

MEMO OF POINTS AUTHORITIES IN SUPPORT OF
MOTION FOR ORDER CONFIRMING ARBITRATION
AWARD AND FOR ENTRY OF JUDGMENT

## DECLARATION OF GERALD D. KIM

I, GERALD D. KIM declare as follows:

1.     I am an attorney licensed to practice law in the State of California and admitted to this Court. I am the attorney of record for petitioner Screen Actors Guild, Inc. ("SAG") in this matter.

2.     This Declaration is submitted in support of SAG's motion for order confirming arbitration award and for entry of judgment in conformity therewith. I prepared the foregoing motion. The allegations contained in the motion are true to the best of my knowledge, except those that are stated on information and belief. As to those matters, I believe them to be true.

3.     Established in 1933, SAG is a union that represents nearly 120,000 actors who work in motion pictures, television, and other media formats.

4.     Respondent Dominion Entertainment, Inc. ("Dominion Entertainment") and SAG executed a Theatrical Adherence Letter ("Theatrical Adherence Letter") and a Screen Actors Guild Modified Low Budget Agreement ("Low Budget Agreement"), both dated April 6, 2000, in connection with the motion picture entitled *Gangland* (collectively "Movie"). Among other things, said agreements bound Dominion Entertainment to the terms and conditions of a collective bargaining agreement, the Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, as amended ("Basic Agreement"). True and correct copies of the Theatrical Adherence Letter and Low Budget Agreement are attached hereto as Exhibit A.[1]  A true and correct copy of relevant portions of the Basic Agreement is attached hereto as Exhibit B.[2]

5.     Dominion Entertainment executed a Security Agreement, dated April 7, 2000, in favor of SAG to secure the performance of all of Dominion

///

---

[1] All referenced exhibits throughout the memorandum of points and authorities are expressly incorporated herein as if set forth in full.
[2] Because the Basic Agreement is 656 pages in length, only relevant portions of the document have been attached.

DECLARATION OF GERALD D. KIM IN SUPPORT THEREOF

1   Entertainment's obligations, including payment obligations to SAG's members,

2   with respect to the Movie ("Security Agreement").

3       6.      Pursuant to the terms of the Theatrical Adherence Letter, Low Budget

4   Agreement, the Basic Agreement, and the Security Agreement, Dominion

5   Entertainment produced the Movie using SAG actors or other performers covered

6   by said agreements (collectively "Performers").

7       7.      On information and belief, Razor Digital Entertainment LLC ("Razor

8   Digital Entertainment") acquired certain copyrights to the Movie.  (Dominion

9   Entertainment and Razor Digital Entertainment shall be referred to collectively as

10   "Respondents".)

11      8.      Respondents exhibited the Movie in one or more non-theatrical

12   markets.

13      9.      As a result, Respondents became obligated to pay Performers

14   additional compensation, known as residuals, pursuant to section 5 of the Basic

15   Agreement.  A true and correct copy of relevant portions of the Basic Agreement is

16   attached hereto as <u>Exhibit B</u>.  Additionally, pension and health contributions ("P &

17   H") became due and payable on behalf of Performers pursuant to section 34 of the

18   Basic Agreement.  *Id.*

19      10.     Respondents failed or refused to pay the amounts due to Performers.

20      11.     Because Respondents failed or refused to pay residuals, late payment

21   liquidated damages ("LPLDs") also became due pursuant to section 5(E) of the

22   Basic Agreement.  A true and correct copy of relevant portions of the Basic

23   Agreement is attached hereto as <u>Exhibit B</u>.

24      12.     On January 3, 2006 pursuant to the arbitration provision (section 9) of

25   the Basic Agreement, SAG served a statement of claim and demand for arbitration

26   on Respondents for failure to pay the above residuals, pension and health

27   contributions as well as LPLDs.  A true and correct copy of relevant portions of the

28   Basic Agreement is attached to Kim Dec. as <u>Exhibit B</u>.  A true and correct copy of

DECLARATION OF GERALD D. KIM IN SUPPORT
THEREOF

1  the statement of claim and demand for arbitration, including proof of service, is

2  attached to Kim Dec. as Exhibit C.

3      13.    The statement of claim and demand for arbitration was served in

4  accordance with the notice provision (section 42) of the Basic Agreement.  A true

5  and correct copy of relevant portions of the Basic Agreement is attached to Kim

6  Dec. as Exhibit B.

7      14.    Sara Adler ("Arbitrator") was selected as the sole neutral arbitrator.

8  SAG notified Respondents by letter, dated October 6, 2006, at their last known

9  addresses regarding the arbitration hearing to be held on November 6, 2006.  The

10  arbitration date was later continued to January 26, 2007.  A true and correct copy

11  of the notice of arbitration hearing is attached to Kim Dec. as Exhibit D.[3]

12      15.    Pursuant to the arbitration provision of the Basic Agreement, Sara

13  Adler issued an arbitration award ("Arbitration Award"), dated March 16, 2007, in

14  favor of SAG and against Respondents.  A true and correct copy of the Arbitration

15  Award is attached hereto as Exhibit E.

16      16.    Respondents were notified of the arbitration award, including a copy

17  of the award.  True and correct copies of letters to the arbitration parties, notifying

18  them of the award, is attached to Kim Dec. as Exhibit F.

19      17.    Despite SAG's demand, Respondents have failed and continues to fail

20  to pay SAG the total amount of $95,000 required by the Arbitration Award, and to

21  otherwise comply with the Arbitration Award.

22      18.    Pursuant to Local Rule 7-3, I talked by telephone on March 4, 2011

23  with David DeFalco of Dominion Entertainment regarding SAG's dispute with

24  Dominion Entertainment and regarding the present the motion for order confirming

25  arbitration award and for entry of judgment in conformity therewith.  On the same

26  date, I left a voicemail message with Jeffrey Fergason [sic] of Razor Digital

27
28  [3] The October 6, 2006 letter from SAG to Respondents contains two typographic errors: (i) it refers to an earlier letter dated "January 5, 2005" which was actually dated "January 3, 2006", and (ii) it refers to an "Amended Statement of Claim and Demand for Arbitration" which was actually a "Statement of Claim and Demand for Arbitration."

DECLARATION OF GERALD D. KIM IN SUPPORT
THEREOF

1  Entertainment regarding the same matter.   Also on the same date, I sent a letter to

2  both Respondents regarding SAG's dispute with the parties and the present motion.

3  A true and correct copy of SAG's correspondence to Respondents is attached

4  hereto as <u>Exhibit G</u>.  Respondents, however, failed to resolve the present dispute or

5  to respond to SAG.

6      19.    In addition to confirmation of the Arbitration Award and entry of

7  judgment in conformity therewith, SAG seeks attorney's fees and costs.

8      20.    I graduated from Cornell Law School in 1999 and have practiced law

9  since that time first in Washington, DC and then in California, where I was

10  admitted to the Bar in December 2001.  I am also admitted to practice in the U.S.

11  District Court for the Central District of California.

12      21.    I have practiced in-house with the Screen Actors Guild since

13  April 2009.  In that capacity, I represent SAG and its members in a wide variety of

14  arbitrations and litigation arising under SAG's collective bargaining agreements.

15      22.    I have reviewed my activities on behalf of SAG in this matter.  In

16  calculating the hours set forth herein, I have considered my time in preparing the

17  present declaration and related notice of motion and motion, memorandum of

18  points and authorities, proposed judgment, notice of interested parties, as well as

19  correspondence and attempted communications with Respondents and my

20  estimated travel and court time.

21      23.    I have calculated the reasonable market value of my services by taking

22  the prevailing hourly rate of private attorneys whose practices focus on labor

23  relations law in the entertainment industry and assessing my rate within the lower

24  to mid-range of that scale.  Based upon those rates, a reasonable rate for an

25  attorney of my background and experience is $400.00 per hour.

26      24.    Fees awarded in this action will not inure to me personally, but will be

27  paid to SAG, a non-profit corporation and certified labor organization.

28  ///

DECLARATION OF GERALD D. KIM IN SUPPORT
THEREOF

25.    The total compensation for which SAG is entitled for my services is $3,200.00, which was computed as follows: 8 hours at $400.00 per hour.

26.    The costs incurred in this action total $350.00 in filing costs.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Los Angeles, California, March 16, 2011.

_____
Gerald D. Kim

DECLARATION OF GERALD D. KIM IN SUPPORT THEREOF

**"EXHIBIT A"**

rev. 5/12/98



# SCREEN ACTORS GUILD

## <u>THEATRICAL ADHERENCE LETTER</u>

Dear Producer:

This will set forth our understanding and agreement as follows:

    1.   The undersigned Producer hereby acknowledges receipt of the Screen Actors Guild Codified Basic Agreement of 1995 for Independent Producers, (herein called the "Agreement") and the amendments and modifications, effective July 1, 1998 ("Amendments") which sets forth the terms and working conditions for performers and extra performers. It is agreed that this letter is part of the aforesaid Agreement and Amendments, and by executing this letter, the undersigned Producer and Screen Actors Guild (herein called the "Guild") shall be deemed to have executed the Agreement and Amendments.

    2.   Producer agrees to give the Guild at least fifteen (15) working days advance notice of the commencement of each production within the scope of the aforesaid Agreement.

    3.   Producer agrees that prior to the commencement of principal photography of each motion picture to be produced hereafter, if Producer is not also the Distributor on free television or in supplemental markets of such picture, Producer shall obtain from the Distributor having such distribution rights a separate written Agreement called "Distributor's Assumption Agreement", made expressly for the benefit of the Guild as representative of the performers involved by which such Distributor agrees to assume and pay the amounts required by the aforesaid Agreement by reason of the exhibition of such picture on free television and in supplemental markets when such sums become payable. The form of such Assumption Agreement is attached hereto.

    4.   The Guild may, in its discretion, require financial assurances with respect to each and every motion picture produced hereunder, in the form of a bond, cash deposit, security agreement, and/or other appropriate form, where it appears to the Guild to be necessary for the protection of the performers employed by Producer.

    5.   Failure to comply with the foregoing provisions with respect to any motion picture to be produced hereunder shall be a substantial breach of this Agreement, and the Guild shall have the right to withhold the services of its members with respect to any such motion picture until such provisions are satisfied.

Very truly yours,

ACCEPTED AND AGREED:

_Dominion Entertainment, Inc._
(Company)

SCREEN ACTORS GUILD

By: _Ollie Abrahams_
Assistant Hollywood Executive Director

By: _David De Falco_
(Signature)

Date: _4/28/00_

_David DeFalco, President_
(Print Name and Title)

_100 Universal City Plaza Bldg #9128_
(Address)

_Universal City   CA   91608_

Date: _4/6/00_

5757 WILSHIRE BOULEVARD ∗ LOS ANGELES, CA 90036-3600 ∗ TELEPHONE (213) 954-1600 ∗ FAX (213) 549-6886

Branch of Associated Actors and Artistes of America / AFL-CIO   us3   Affiliate of International Federation of Actors

**SIGN AND RETURN**

#39 - TH-R

**SCREEN ACTORS GUILD**
**MODIFIED LOW BUDGET AGREEMENT**

The Screen Actors Guild (hereinafter SAG or the Guild) has agreed on a trial basis to modify, to the extent hereafter set forth, certain of the terms and provisions of the current Basic Codified Agreement for Independent Producers (hereinafter "Basic Agreement") with respect to the employment of performers in the motion picture presently entitled _Gangland_ (hereinafter the "Picture").

_David DeFalco_ (hereinafter "Producer") acknowledges receipt of a copy of the Basic Agreement.

IT IS THEREFORE AGREED BETWEEN PRODUCER AND SAG:

1.    Acceptance as Signatory Producer

Upon signing this Agreement and its acceptance by the Board of Directors of the Guild, Producer will be signatory to the Basic Agreement.

2.    Qualification to Produce under this Modified Low Budget Agreement

Producer has represented to the Guild that the Picture is a feature-length motion picture (not less than 80 minutes) with an initial theatrical release to be filmed entirely within the United States and a total production cost of less than $500,000. "Total production cost" includes any costs associated with the production, including but not limited to all "above and below the line" costs. An "initial theatrical release" is defined as release of the Picture in at least one theater for a period of not less than two weeks. Prior to the execution of this Agreement, you are required to submit to the Guild a complete, accurate detailed budget, the shooting script, the shooting schedule, the screenplay copyright ownership and registration documentation and any other relevant information which the Guild may require to verify your representations with regard to the Picture.

3.    Minimum Salaries

A)    Each performer employed in the picture shall be paid not less than the minimums as set forth below:

| | |
|---|---|
| Day Performer | $ 248.00 |
| Daily Stunt Performer | 248.00 |
| Weekly Performer (5 day week) | 864.00 |
| Weekly Stunt Performer (5 day week) | 927.00 |

| Singers employed by the day | |
|---|---|
| Solo/Duo | $ 268.00 |
| Group 3-8 | 236.00 |
| Group 9 or more | 206.00 |
| Mouthing 1-16 | 200.00 |
| Mouthing 17 or more | 155.00 |

| | |
|---|---|
| Sweetening (w/ or w/o overdubbing) add'l per day | +100% |

SAG Modified Low Budget Agreement - Page 2 of 6

|  |  |
|---|---|
| Overdubbing only, an add'l | +33-1/3% |
| **Singers employed by the 5 day week** | |
| Solo and duo | $ 864.00 |
| Group 3-8 | 793.00 |
| Group 9 or more | 720.00 |
| **Step Out Rates per day** | |
| Up to 15 cumulative bars | $ 134.00 |
| 16 + cumulative bars, or if detained after group is released to perform a solo or duo of any length | 268.00 |
| **Contractor Rate:** | |
| 3-8 singers | +50% |
| 9 or more singers | +100% |
| **Dancers employed by the day** | |
| Solo and Duo | $ 248.00 |
| Group 3-8 | 217.00 |
| Group 9+ | 190.00 |
| **Dancers employed by the 5-day week** | |
| Solo and Duo | $ 864.00 |
| Group 3-8 | 785.00 |
| Group 9+ | 724.00 |
| **Stunt Coordinator Employed on a "Flat Deal"** | |
| Daily | $ 950.00 |
| Weekly | 3,750.00 |

B)   All payments shall be made by net check, payable to the order of the individual performer entitled thereto and delivered to the Guild.  Each check must be accompanied by a separate written statement indicating dates worked, overtime, adjustments, reimbursements, payroll deductions and name and address of the performer's "employer of record."

C)   Agreement of the parties as to application of the 1990 Extra Performers Agreement as incorporated into the Basic Agreement shall be negotiated in good faith prior to commencement of principal photography.

4.   <u>Overtime, Premium Pay and Liquidated Damages</u>

Premium pay and liquidated damages shall be computed and paid to all performers as provided in

the Basic Agreement and shall be based on the performer's contractual salary. However, all daily overtime for Day Performers and Weekly Performers through the 12th hour of the performer's day shall be paid at "time and a half" rates. Daily overtime beginning with the 13th work hour shall be paid at double time rates.

5.   Consecutive Employment

Subject to each performer's written consent, which must be given prior to commencement of employment, the Guild waives the application of its consecutive employment rules for Day Performers and Weekly Performers; however, Weekly Performers must be employed and paid in units of no less than one (1) full week. Additional days in any final partial workweek for a Weekly Performer may be prorated at one-fifth of the weekly base rate for each day from commencement of the Performer's work in such workweek until Performer's final dismissal. Subject to the foregoing, Weekly Performers may be dismissed and recalled without payment for intervening days. In exchange for this waiver, you agree to waive your right to exclusive services of the Performer during photography. Scheduling shall be subject to each Performer's availability.

Notwithstanding the provisions of this Section, any Performer who is not returned to the city from which the Performer is based shall be paid for each day (whether worked or not) in accordance with the appropriate consecutive or continuous employment rules in the Basic Agreement until the Performer is so returned by Producer.

6.   Rehearsal Payments

All time worked, including overtime, on days involving rehearsal only (no other work) shall be paid at straight time rates under this Agreement.

7.   Waiver for 6th Day Shooting Schedules

Provided each performer is given at least thirty-six (36) consecutive hours off in each seven (7) days and subject to each performer's prior written consent, a performer may be called for work on a sixth consecutive day of work without the payment of a premium. Provided, that performer is paid not less than an additional day's pay (one fifth of the weekly rate for a weekly performer) for each such sixth day.

8.   Responsibilities of Producer

A)   Producer shall maintain and submit to the Guild each week complete production records including but not limited to production time reports and employment contracts. At the conclusion of principal photography, a Final Cast List Information Sheet shall be submitted stating the gross salaries paid thus far to all Performers and whether or not additional photography or sound recording shall be required. Note that failure to submit such reports subject Producer to the assessment of significant damages as detailed in the Basic Agreement.

B)   Producer agrees to submit to the Guild at least seven (7) days prior to any submission to agents, a cast breakdown setting forth a definitive description of each character in the production and instructions for Performer submissions. Producer agrees to hold at least two (2) interview sessions during the casting period at which only

professional Performers will be auditioned for the cast. Producer shall specify the dates, time and places of such interviews by written notice to the Guild submitted at the same time as Producer submits the cast list to the Guild, and shall utilize an audition sign-in sheet for all auditions or interviews, as required by the Basic Agreement.

C)   <u>Cast Meeting</u>

Prior to the commencement of principal photography, Producer shall schedule a cast meeting with the Guild's staff. The purpose of this meeting is to provide members of the cast with information regarding this Agreement under which they are being employed. Producer shall not be present at this meeting.

D)   <u>Pension & Health Contributions</u>

Producer's contribution to the Producer-Screen Actors Guild Pension & Health Plans as provided in the Basic Agreement (at the rate of 13.15% of all gross compensation for performers) shall be payable at the time of production. Such payments shall be made to the Pension and Health Plans concurrently with payment of such salaries to the Performer. Copies of the Pension and Health Report filed with such contributions shall be filed weekly with the Guild office. Failure to make timely payment to Pension and Health plans shall cause the assessment of late payment damages in accordance with the Basic Agreement.

E)   <u>Social Security, Withholding Taxes, Unemployment & Disability Insurance</u>

All compensation paid to Performers under the terms of this Agreement shall constitute wages and is subject to deductions for Social Security, Taxes and Disability Insurance. Producer shall make the required payments, reports and withholding deductions with respect to such taxes and premiums. Producer shall also provide unemployment insurance for Performers employed by Producer.

F)   <u>Final Cost Report</u>

Upon completion of principal photography, Producer shall submit to the Guild a detailed report of actual expenditures and other relevant materials as the Guild may require, showing actual cost of the production. In the event that the actual production costs for the picture have exceeded $500,000.00, full payment of any additional sums necessary to bring each performer's rate of pay in compliance with the minimum rates specified in the Low Budget Agreement automatically shall become due and payable. Pension and Health contributions shall also be paid on these additional amounts.

G)   <u>Film Clips</u>

On the request of any Performer appearing in the picture, Producer shall supply or make available to such Performer, no later than six (6) months following completion of principal photography, a film clip of a portion of his/her performance at actual cost.

H)   Acknowledgment

The following statement shall be incorporated in the credits of the Picture: "Special Thanks to Screen Actors Guild."

9.   Exhibition of the Picture

A)   Theatrical Exhibition
An initial theatrical release is required. No additional compensation shall be due the performers in connection with the theatrical exhibition of the Picture. In flight exhibition is deemed included in theatrical exhibition.

Prior to the initial theatrical release of the Motion Picture, Producer must notify the Guild in writing, of the date, city and theater where such initial theatrical release is to take place. The notice is to be addressed to the attention of the Theatrical Contracts Department. Failure to provide such notification shall be considered a substantial breach of this agreement, and all minimum terms of the current Basic Codified agreement for Independent Producers shall apply to the entire production.

B)   Free Television Exhibition
In connection with release to Free Television worldwide, the Producer agrees to pay 7.2% of the worldwide Distributor's Gross Receipts to the performers.

C)   Supplemental Market Exhibition
(i)   In connection with release on videocassettes, the Producer        to pay 9% of the first one million dollars ($1,000,000.00) of worldwi         ibutor's Gross Receipts and 10.8% of the worldwide Distributor's Gross R         in excess of the one million dollars ($1,000,000.00) to the performers.

(ii)   In connection with release on Pay Television, the Producer agrees to pay 7.2% of the worldwide Distributor's Gross Receipts to the performers.

10.   General Provisions

A)   Security and Assumption Agreements

Producer agrees to execute, concurrently herewith, documents necessary to grant the Guild a first position security interest in the Picture, to secure all payments which may be due Performers or the Guild in connection with the Picture.

If Producer enters into a distribution agreement for the distribution of the Picture on free television or supplemental markets, or if Producer sells, transfers, or assigns the rights in the Picture, Producer shall obtain from the distributor or the purchaser, as the case may be, a Distributor's Assumption or Buyer's Assumption Agreement, in the forms set forth in the Basic Agreement, and such Assumption Agreement shall be promptly delivered to the Guild.

Producer agrees to provide all financial assurances required by the Guild in

connection with the employment of performers in the Picture.

B)   The provisions of the Basic Agreement with respect to the employment of minors shall be applicable to the engagement of minors hereunder.

C)   The provisions of the Basic Agreement with respect to the arbitration of disputes shall be applicable to the employment of performers hereunder.

D)   <u>Application of Basic Agreement</u>

Except as expressly modified herein, all terms and conditions of the current Basic Codified Agreement for Independent Producers shall apply to the engagement and performance of the Performers hereunder.

E)   <u>Successors and Assigns</u>

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Your signature in the space provided below will indicate your agreement to the provisions hereof.

Very truly yours,

SCREEN ACTORS GUILD, INC.

By: _____   Title: _____

ACCEPTED AND AGREED TO:

By: _____  PRESIDENT   Date: 4/6/00
     (Signature)            (Title)

David De Falco, President
     (Print name)

For: Dominion Entertainment, Inc.
     (Company)

**"EXHIBIT B"**

# SCREEN ACTORS GUILD
## CODIFIED BASIC AGREEMENT OF
### 1995
## FOR INDEPENDENT PRODUCERS



**TERM: JULY 1, 1995 - JUNE 30, 1998**

# GENERAL PROVISIONS

## Table of Contents

General
Provisions

Section
Number

1.     Recognition and Scope of Agreement
2.     Union Security
3.     Strikes
4.     Theatrical Motion Pictures, the Principal Photography of Which Commenced Between January 31, 1960 and July 21, 1980 Released to Free Television
5.     Television Exhibition of Theatrical Motion Pictures, the Principal Photography of Which Commenced After October 6, 1980
5.1    Supplemental Markets Exhibition of Theatrical Motion Pictures, the Principal Photography of Which Commenced After June 30, 1971 but Prior to July 1, 1984
5.2    Supplemental Markets Exhibition of Theatrical Motion Pictures, the Principal Photography of Which Commenced After July 1, 1984
5.3    Copyright Royalty Tribunal
6.     Responsibility for Payments
6.1    Residual Audits
7.     Theatrical Motion Pictures, the Principal Photography of Which Commenced Prior to February 1, 1960
8.     Original Employment - Pay Television, Videodisc/Videocassette Markets
9.     Arbitration
10.    Newsreels, Travelogues, Narrations, etc.
11.    Agreement and Schedules Incorporated in Performer's Contract-- Waivers
12.    Better Terms and Conditions
13.    Undirected Scenes - Public Events
14.    Preference of Employment
15.    Application to Existing Contracts
16.    Contracts Delivered on Set
17.    Industry - Union Cooperative Committee
18.    Trailers and Promotional Films
19.    Furnishing Reports
20.    Prohibition Against Crediting
21.    Dressing Rooms and Other Facilities
22.    Reuse of Photography or Sound Track

i

**General Provisions**

**Table of Contents Con't**

**Section Number**

| | |
|---|---|
| 23. | Air Travel and Flight Insurance |
| 24. | Independent Production |
| 25. | Screen Credits |
| 26. | Non-discrimination and Equal Employment Opportunity |
| 27. | Tours and Personal Appearances |
| 28. | Injuries to Persons or Property During Performance; Safety |
| 29. | Loan-Outs |
| 30. | Production Staff |
| 31. | Production Time Reports, Late Payments, Overwithholding and Payroll and Unemployment Insurance Information |
| 32. | Industry Advancement and Cooperative Fund |
| 33. | Subcontracting |
| 34. | Pension and Health Plans |
| 35. | Additional Provisions |
| 36. | Term and Effective Date |
| 37. | Financial Assurances |
| 38. | Separate Agreement as to Each Producer |
| 39. | Other Producers May Become Parties |
| 40. | Purpose of Codification - Saving Clause - Title |
| 41. | Rules of Construction |
| 42. | Service of Notice |
| 43. | Nudity |
| 44. | Humane Treatment of Animals - Statement of Policy |
| 45. | Videotape |
| 46. | Verification of Television Runs - Coding |
| 47. | Casting |
| 48. | Favored Nations Clause |
| 49. | Photography of Stage Performance (Instant Movies) |
| 50. | Employment of Minors |
| 51. | Alcoholism and Drug Abuse Program |
| 52. | Translation |
| 53. | Temporary Employment - Non-Resident Alien Performers |
| 54. | Definition of Network |
| 55. | Stunt Coordinators |
| 56. | Body Doubles |
| 57. | Dubbing |
| 58. | Work in Smoke |
| 59. | Right to Terminate; Unfair List |
| 60. | Access to Sets |
| 61. | Miscellaneous |

4.   **THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED BETWEEN JANUARY 31, 1960 AND JULY 21, 1980 RELEASED TO FREE TELEVISION**

Theatrical motion pictures produced under a prior Screen Actors Guild Codified Basic Agreement, the principal photography of which commenced between January 31, 1960 and July 21, 1980 and which are released to free television, shall be governed by the provisions relating to additional compensation payable to performers for exhibition of theatrical motion pictures on free television of the applicable Codified Basic Agreement under which such pictures were produced.

5.   **TELEVISION EXHIBITION OF THEATRICAL MOTION PICTURES, THE PRINCIPAL PHOTOGRAPHY OF WHICH COMMENCED AFTER OCTOBER 6, 1980**[1]

A.   With respect to theatrical motion pictures, the principal photography of which commenced after October 6, 1980 and released to free television anywhere in the world, Producer agrees to pay to SAG a deferred compensation, for rateable distribution to the performers appearing in such pictures, equal to six percent (6%) of the worldwide total gross receipts from the distribution of such pictures on free television, after deducting a flat amount of forty percent (40%) of such total gross receipts for distribution fees and expenses. Said compensation shall include pension and health contributions. Such pension and health contributions shall be at the rate provided in and subject to the ceiling and other provisions of Section 34 hereof or of the "Pension and Health Plans" provision of the Agreement under which such picture was produced, whichever is applicable.

When the Producer does not itself so distribute such picture, but effects its distribution through another distributor, the percentage paid shall be based on such distributor's gross receipts from such distribution of such picture on free television, after deducting said flat amount of forty percent (40%) from such total gross receipts, payable only after they are received by the Producer, and after such forty percent (40%) deduction. When Producer is paid advances by a distributor, the above percentage shall likewise be payable on the amount of such advances. When Producer sells outright the right to exhibit on free television, SAG shall be paid promptly the above percentage on the gross amounts actually received by Producer for such free television exhibition

---

[1] The Screen Actors Guild was on strike against the Producers during the period July 22, 1980 through and including October 5, 1980. The terms of an interim agreement may be applicable to performers who were employed in motion pictures produced during that period.

rights, after deducting a flat amount of ten percent (10%) of such gross amounts so received by Producer from such outright sale of free television exhibition rights, for sales commission and expenses of sale.

If any such outright sale shall include both free television exhibition rights and other rights with respect to one or more pictures, the Producer shall allocate, to the free television exhibition rights covered by such sale, a fair and reasonable sale price (but only for the purpose of determining the percentage payment due hereunder) based on the sale of free television exhibition rights in comparable pictures. If SAG shall contend that the amount so allocated in any such outright sale for free television exhibition rights was not fair and reasonable as aforesaid, then such claim shall be submitted to arbitration as herein provided. In the event the arbitrator shall find that such allocation was not reasonable and fair as aforesaid, he shall determine the fair and reasonable amount to be so allocated. When the sale is of the free television exhibition rights only in a group of pictures, Producer shall likewise make an allocation of a portion of the sale price to each picture. If SAG contends that allocation is not fair and reasonable, the matter may be similarly submitted to arbitration, as above provided. In the event the arbitrator shall find that such allocation was not reasonable and fair, as aforesaid, he shall determine the fair and reasonable amount to be so allocated.

The provisions of the preceding paragraph shall not apply to any sale of free television exhibition rights only in a single picture.

The term "performer" means those persons covered by this Agreement and includes performers, professional singers, stunt performers, airplane and helicopter pilots, dancers[2], stunt coordinators[3] and puppeteers, but excludes body doubles.

B.    Distribution Formula

The amount received by Screen Actors Guild under the formula set forth in Paragraph A, above shall be distributed as follows:

---

[2]

Only dancers employed under Schedule J of this Agreement are entitled to participate in the monies payable pursuant to this Section.

[3]

Stunt coordinators employed under this Agreement are entitled to participate in the monies payable pursuant to this Section. All compensation paid for stunt coordinating services and any other services covered by the Agreement shall be combined in calculating salary units under subsection B.(2) hereof.

8

Units will be assigned to performers entitled to participate as follows:

(1)     Time Units

With respect to each performer, units for time worked shall be computed as follows:

Each day = one-fifth (1/5) unit
Each week = one (1) unit

No more than five (5) time units may be credited to any performer.

(2)     Salary Units

With respect to each performer, units for total compensation received from the film shall be credited as follows:

(a)     Day Performer: Each multiple of daily scale equals one-fifth (1/5) unit. A fraction of daily scale, when more than one-half (1/2), shall be credited as another one-fifth (1/5) unit.

(b)     All Other Performers: Each multiple of weekly scale equals one (1) unit. A fraction of a multiple, when more than one-half (1/2) of weekly scale, shall be credited as another weekly unit.

(c)     No more than ten (10) salary units may be credited to any performer.

(3)     Computation

Each performer shall be credited with the sum of time and salary units as computed above, and each performer will receive that rateable proportion of the monies as the performer's number of units bears to the total number of units for the entire cast.

C.     With respect to such pictures made outside of the United States, when part of the cast is composed of performers subject to this Agreement and part of the cast of performers is not subject to this Agreement, then sums payable hereunder shall be prorated based on the proportion which the salaries and the time worked payable to the performers subject to this Agreement bear to the total performers' salaries and time worked for the picture. If records reflecting time worked are not reasonably available, then the aforementioned proration may be based on salaries alone.

D.     <u>Application to Pictures Initially Released Theatrically</u>

        The provisions of this Section 5 regarding additional compensation for free television exhibition apply only to a theatrical motion picture which is exhibited on free television after it has had a *bona fide* theatrical release. Such motion picture exhibited on free television that has not had a *bona fide* theatrical release shall be governed by the Screen Actors Guild Television Agreement then in effect, but only with respect to the provisions relating to additional compensation for reruns and foreign telecasts, or as may otherwise be agreed upon between the Producer and the Union.

        The provisions of this Section 5 shall not apply to the televising of trailers or advertising a motion picture by shots, etc., substantially in the nature of a trailer, subject to the limitations provided in Section 18 hereof.

E.     <u>Time and Method of Payments</u>

        With respect to the initial payment due hereunder for network television exhibition, such payment shall be due and payable within thirty (30) days after the initial broadcast of such motion picture on a network.

        With respect to the initial payment due hereunder for television exhibition, other than network television, such payment shall be due and payable within four (4) months after the initial broadcast of such motion picture on free television other than network television.

        All such payments hereunder shall be made by check, payable to the order of the performer entitled thereto, and delivered to the Union for forwarding to such performer. Producer shall make all Social Security, withholding, unemployment insurance and disability insurance payments required by law with respect to the additional compensation provided for in this Section 5. Compliance herewith shall constitute payment to the performer.

(1)     Network

        With respect to network television exhibition, in the event Producer shall fail to pay such additional compensation when and as the same becomes due and payable, the Producer shall pay a late payment charge in the amount provided in Section 31.B. hereof until such additional compensation is paid.

(2)     Syndication and Foreign Telecasting

        With respect to syndication and foreign telecasting, in the event Producer fails to pay such additional compensation within ten (10) days from the date of a notice in writing to Producer from the Union, a late payment penalty shall